1188

J. D. PULLER, EXECUTOR, ESTATE OF JOHN T. DISMUKES, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 37098.   Promulgated July 17, 1931.

*W. A. MacWilliams, Esq.*, for the petitioner.
*Arthur Carnduff, Esq.*, for the respondent.

OPINION.

TRAMMELL: This proceeding is for the redetermination of a deficiency in estate tax of $22,792.40. The only matter in controversy is the value, at the time of the decedent's death, of certain real property owned by him.

The petitioner is the executor of the estate of John T. Dismukes. Dismukes, hereinafter referred to as the decedent, died testate and a resident of St. Augustine, Fla., on December 4, 1925. At the time of his death he owned certain real estate situated in Florida and hereinafter referred to for convenience as the Palm Beach County property, the water front property, the garage property and the St. George Street property.

The Palm Beach County property consisted of 67.88 acres of wild, unimproved land situated in Palm Beach County about 25 miles south of Palm Beach. This land is about one mile west of Villa Rica, about four miles southwest of Del Ray Beach and about the same distance from Boca Raton. It is also near Crossatana. A flag station of the Seaboard Airline Railroad called Yamato is located near the south end of the tract. A hard surface road on the south side of the land runs out to the Dixie Highway, which is about one mile east of the tract. The nearest houses to the property in December, 1925, were the homes of three Japanese. This land slopes from north to south and along its north and west sides is a canal which affords drainage and is available for irrigation if that should become necessary. On the northern portion of the land is a considerable growth of cabbage palmetto trees. The land is more suitable for agricultural purposes than for subdivision purposes. However, due to the fact that in 1925 there were more buyers than there was property for sale it had a reasonably high value for subdivision purposes or for sale to someone who wished to subdivide it.

About December 4, 1925, ditches were being put in at Crossatana and a great many lots were being sold, but no building was being done. At Villa Rica a great many lots were sold on contract in

1925, streets and lights were being put in and while the construction of several houses was begun only three were completed. In 1925 there was quite a real estate development at Boca Raton, where there were 625 residences, a number of stores and a hotel.

The "boom" in Florida began in a gradual manner in 1923 and lasted until about March, 1926. It reached its peak in the summer of 1925 and was going "fairly strong" in October and November, 1925.

In the estate-tax return the petitioner reported the Palm Beach County property as consisting of 80 acres and as having a value of $100 per acre, or a total value of $8,000 at the time of decedent's death. In determining the deficiency here involved the respondent determined that the property consisted of 83.9 acres and that it had a value of $1,000 per acre, or a total value of $83,900. At the hearing it was conceded that both parties were in error as to the acreage and that the correct amount is 67.88 acres.

With respect to the value of the Palm Beach County property at the time of decedent's death, the petitioner submitted the testimony of two witnesses who testified to a value of $250 per acre, while the respondent offered the testimony of two witnesses who were of the opinion that it had a value of $1,000 an acre. Another witness for the respondent was of the opinion that the property had a value of $500 per acre. Considering the conflict in the testimony, and being impressed with the fairness of the last-mentioned witness, his competency and the basis for his opinion, we are of the opinion, from a consideration of all the evidence before us, that the property had a value on December 4, 1925, of $500 an acre or a total value of $33,890.

The remaining properties were all situated in St. Augustine, where during 1925 and a part of 1926 considerable activity in real estate dealings developed as a result of the general "boom" condition existing throughout the State of Florida. On December 4, 1925, there was a "boom activity" in and around St. Augustine brought about by the fact that the D. P. Davis Organization had during 1925 made large purchases of land on the island opposite the city for a large development known as Davis Shores. This organization had completed a successful development on Davis Island in Tampa which had received wide recognition, and the announcement of the plans for Davis Shores stimulated real estate values and activities although the actual development of Davis Shores did not begin until January 1, 1926.

The water front property consisted of five lots situated in the northern part of the city of St. Augustine, having a total frontage of 262 feet on Hospital Creek and extending back to Water Street. Prior to being filled in and reclaimed by the decedent about 1915,

this property was, with the exception of a narrow strip of shore line running the length of it, marsh land connected with the Matansas River.

By a special act of the Legislature of the State of Florida in 1913 all unsurveyed marsh lands within and adjacent to the city of St. Augustine lying in and bordering along the Matansas River and certain other streams and not owned by private parties were granted to the city of St. Augustine for the period of 1,000 years for purposes of commerce, navigation, municipal docks and terminals with the privilege, among other things, of filling in and building up shallows and middle ground or flats in this river and the other streams. This grant was made on the condition that the improvements provided for in the act be commenced within 25 years from the passage of the act. For and in consideration of the decedent having filled in and reclaimed a certain portion of the marsh lands situated in the city of St. Augustine, the city on June 30, 1920, executed to the decedent a quitclaim deed to certain lands including the water front property here involved. Although the decedent had obtained a quitclaim deed from the city of St. Augustine for the water front property, there was still in 1925 a question as to the validity of his title to it, as under the law there was a serious question of the right of the city to convey, transfer or release its title or interest. This seriously affected the marketability of the property.

The water front property was reported by the petitioner as having a value of $15,000 at the time of the decedent's death. The respondent in determining the deficiency valued it at $40,000.

While testimony was offered by both parties as to the value at the time of decedent's death of the water front property, the witnesses clearly indicated that the values testified to were such as the property would have had if there had not been any question about the title. Considering all the evidence relating to this piece of property, we do not think it had a value in excess of the amount at which it was reported by the petitioner, and accordingly hold that its value on December 4, 1925, was $15,000.

The garage property was situated on the west side of Charlotte Street between Treasury Street and Hypolita Street in the city of St. Augustine, and consisted of a lot 48 feet by 170 feet with a two-story building 27 feet by 24 feet thereon. The building was erected in 1923 and was of stucco over frame construction. The lower story of the building was used as a garage for two cars, while the upper story was used by negroes as living quarters. On one of the lots adjoining this property is a public garage and repair shop while on the other lot there is an apartment house. There are also other apartment houses on other lots on this street.

The garage property was reported in the estate-tax return as having a value of $5,000 at the time of the decedent's death. In determining the deficiency the respondent determined that it had a value of $10,000.

With respect to the value of the garage property at the time of the decedent's death, the petitioner submitted the testimony of two witnesses. One of these was of the opinion that the existing market value of the property at the time of the decedent's death was $7,700. The testimony of the other was to the effect that the value of the property was $9,000. However, as one of the appraisers of the estate of the decedent, he appraised the property in January, 1926, at $10,000. The respondent submitted the testimony of two witnesses who testified to a value of $10,000. Considering the evidence relating to this property, we are of the opinion that it had a value of $10,000 on December 4, 1925.

The St. George Street property consisted of a corner lot 57.6 by 92 feet with two buildings thereon. The lot had a frontage of 57.6 feet on St. George Street and 92 feet on Cuna Street. One of the buildings fronted on St. George Street and was a one-story brick structure 57.6 by 60 feet, containing three store rooms, all of which fronted on St. George Street. In the rear of this building was a small structure. At the time of the decedent's death the property was leased at a monthly rental of $125 per month, the lease to expire in 1927.

The St. George Street property was reported in the estate-tax return as having a value of $10,000 at the time of the decedent's death. In determining the deficiency the respondent valued the property at $30,000.

The petitioner submitted the testimony of two witnesses as to the value of the St. George Street property at the time of the decedent's death. One of these witnesses was of the opinion that the fair market value of the property based on the then existing conditions was $23,000. The testimony of the other witness was to the effect that the property had a value of $15,000. However, as one of the appraisers of the decedent's estate, he appraised the property in January, 1926, at $30,000. The respondent submitted the testimony of two witnesses who were of the opinion that the property had a fair market value of $30,000. From a consideration of all the evidence relating to this property we think it had a value of $30,000 on December 4, 1925.

*Judgment will be entered under Rule 50.*